**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **WALTER BRZOWSKI,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 17 C 9339** |
| ) | |
| **BRENDA SIGLER,** ) | |
| ) | |
| **Defendant.** ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Under 42 U.S.C. § 1983, Walter Brzowski, who was formerly incarcerated at Pontiac Correctional Center, sued Brenda Sigler, the records office supervisor at Pontiac. Brzowski alleged that Sigler violated his rights under the Eighth and Fourteenth Amendments when she repeatedly dismissed his complaints that he was being held beyond his sentence. A trial was held, and the jury returned a verdict in Brzowski's favor. The jury awarded Brzowski $721,000 in compensatory damages and $10,000 in punitive damages.

After the close of Brzowski's case in chief, Sigler moved for judgment as a matter of law under Federal Rule of Civil Procedure Rule 50(a). The Court took the motion under advisement. Now, Sigler has renewed her motion for judgment as a matter of law and has also moved for a new trial under Federal Rule of Civil Procedure 59. For the reasons set forth below, the Court denies both motions.

**Background**

**A.    Underlying facts**

In 2012, Brzowski was convicted in two separate criminal cases in Illinois state court.  His resulting sentences were to run consecutively, and he was to serve a total sentence of four years with day-for-day good time to apply, followed by a term of mandatory supervised release (MSR).  By late 2013, Brzowski had completed his term of actual imprisonment and was released to begin a four-year MSR term.  However, Brzowski was arrested for violating his MSR conditions.  As a result, he was remanded to the Illinois Department of Corrections (IDOC) to serve the remainder of his MSR term in custody.

In the meantime, Brzowski had appealed his convictions.  In 2015, an Illinois appellate court reversed and remanded both convictions.  In order to forgo new trials, the State dropped one of its cases against Brzowski, and he pled guilty to all the charges in the other case against him.  He was re-sentenced to a three-year prison term, followed by four years of MSR.  The sentencing order, dated July 22, 2015, stated that Brzowski was to receive fifty percent good-time credit and that as of the date of the order, he was entitled to credit for 1,452 days of time served in custody.

To facilitate Brzowski's appearance at his July 2015 sentencing hearing, IDOC transferred him from Pinckneyville Correctional Center to its Northern Reception and Classification Center (NRC), located in Joliet.  After the sentencing, Brzowski remained in custody at the NRC.  Eventually, the Illinois Prisoner Review Board reduced Brzowski's four-year MSR term to just two years.

In October 2015, Brzowski was transferred from the NRC to Pontiac Correctional

Center, where he remained until July 2017. From November 2015 through February 2017, Brzowski made thirty complaints that he was being improperly held past his release date. Each of these complaints was referred to Sigler. Sigler became aware of Brzowski's first complaint after another prison official alerted her. The official told Sigler that Brzowski had been referred to the law library, had questions about his sentencing calculation, and that his complaint looked "like a pile of nonsense (and it still could be.)" Dkt. No. 176–2 at ECF p. 138 of 263.

In response to Brzowski's first complaint, Sigler informed Brzowski that she had reviewed both his master inmate file (which included his mittimus and sentencing calculation sheet) and his judgment order and had concluded that he was not to be discharged until April 2017. Sigler summarized her findings as follows: Brzowski had already served his term of imprisonment and had an "MSR [start] date of 1/30/13"; he was "not received at IDOC until 7/28/15"; and "[d]ue to the Johnson Decision"[1], his parole time started on the day he was released from having served his incarceration time, 7/28/15. Dkt. No. 181–5 at ECF p. 20 of 20. Adding four years to that date, Sigler continued, made Brzowski's discharge date "7/28/19." *Id.* She then cited the Prisoner Review Board's October 2015 decision reducing Brzowski's MSR term to two years and concluded that his "discharge date[ ] is 4/28/2017." *Id.* Sigler noted that these calculations had "been performed in accordance with [his] Judgment Order and [his] PRB violation order." *Id.*

After receiving Sigler's initial response, Brzowski continued to file complaints. He told Sigler that her calculation was "incorrect and flawed." *Id.* Sigler replied: "The

---

[1] *United States v. Johnson*, 529 U.S. 53 (2000).

response I sent to you explains you[r] calculation of the Judgment order received.  If you feel you[r] time is calculated incorrect[ly], an amended Judgment order must be received.  You need to contact your attorney or the court."  *Id.*  Sigler's responses to all of Brzowski's subsequent complaints were similar:  she told him that his concern had been addressed and would not be re-visited and that his release date would not change without another sentencing order.  *Id.* at 10, 14; *see id.* at 8-18.

Brzowski was released from prison only after an Illinois appellate court ruled in June 2017 that he had completed service of his term of imprisonment almost two years earlier, in July 2015.  *See Brzowski v. Pierce*, 2017 IL App (3d) 160228-U ¶¶ 15, 20. The court determined that as of July 22, 2015 (the date of the re-sentencing), after applying the credit for time served listed in the sentencing order to the revised sentence—a three-year prison term and a four-year MSR term, with good time credit— he had only eight days remaining on his prison term at that point.  *Id.* ¶ 15.  The appellate court further ruled that the State's reliance on *Johnson* was misplaced.  *Id.* ¶ 17.  Lastly, the court explained that, under 730 ILCS 5/3–3–9(a)(3)(ii), the time Brzowski served while in prison after his 2013 MSR violation should have been credited toward the four-year MSR term in his new sentence.  *Id.* ¶ 18.

By the time of the appellate court's ruling in June 2017, Brzowski had remained imprisoned for nearly two extra years.  *See id.* ¶ 20.  Accordingly, the appellate court reversed and remanded the trial court's denial of Brzowski's 2015 emergency petition for habeas corpus.  On remand, an Illinois trial court ordered Brzowski's release.  IDOC released Brzowski on July 20, 2017.

## B.    Sigler's trial testimony

At trial, Sigler testified that she had been a record office supervisor for fourteen years and, in that time, has performed "thousands and thousands" of sentencing calculations.  Dkt. No. 176–2 at ECF pp. 118, 140 of 263.  Sigler's office is charged with keeping inmate's master files.  *See id.* at ECF pp. 118–119 of 263.  A master inmate file includes an inmate's sentencing order, calculation sheet, and transfer orders.  *Id.* at ECF pp. 124–125 of 263.  Though NRC prepares a temporary sentencing calculation, those calculations are audited when inmates are transferred to Pontiac.  *Id.* at ECF pp. 158–159 of 263.  If—as in this case—either Sigler or one her subordinates determines that the NRC calculation is accurate, it remains in the inmate's master file.  *Id.* at ECF p. 160 of 263.  Conversely, if the NRC calculation is inaccurate, it is replaced with a new calculation sheet.  Dkt. No. 176–3 at ECF p. 47 of 125.

As record office supervisor, Sigler receives, reviews, and responds to inmate grievances about unjustifiably prolonged incarceration.  *See* Dkt. No. 176–2 at ECF p. 141 of 263.  After receiving a complaint, Sigler says, she personally examines the inmate's master file, conducts an audit of the sentencing calculation (by examining the mittimus and the calculation sheet, as well as by completing her own calculation by hand), and responds to the complaint.  *Id.* at ECF pp. 122, 141–43, 187 of 263.  She claimed these were the steps she took after she received Brzowski's initial complaint.  *Id.* at ECF pp. 165–66 of 263.  Sigler said that when she reviewed the sentencing calculation sheet in Brzowski's master file—the calculation sheet prepared by NRC—and recalculated Brzowski's sentence by hand, she was satisfied that the calculation was correct.  *Id.* at ECF pp. 159–60 of 263.

Sigler's calculation was based, in part, on what she said was her interpretation of *Johnson*, *see* dkt. no. 176–2 at ECF pp. 179, 181 of 263, a case in which the Supreme Court held that a federal statute—18 U.S.C. § 3624(e)—did not "reduce the length of a supervised release term by reason of excess time served in prison" for a federal prisoner. *See Johnson*, 529 U.S. at 60. Sigler testified that she had been trained on the case in record office meetings and had read the case at a training (though she could not remember when). Dkt. No. 176–2 at ECF pp. 177–78 of 263. Sigler conceded, however, that: (1) she did not read *Johnson* immediately before auditing Brzowski's calculation, nor did she confirm that it applied to his situation, *id.* at ECF p. 178 of 263; (2) *Johnson* involved a federal inmate seeking release under federal law, and she knew federal and state laws could differ, *id.* at ECF p. 183 of 263; (3) significantly, she knew she could not "fully apply" *Johnson* to Brzowski's situation without consulting legal counsel, *id.* at ECF p. 194 of 263; and (4) though counsel was available, she did not consult counsel before using *Johnson* to reject Brzowski's complaints, *id.* at ECF p. 183 of 263. With regard to 730 ILCS 5/3–3–9(a)(3)(ii)—the statute Brzowski said rebutted Sigler's opinion that *Johnson* required him to remain in prison—Sigler admitted that she never consulted an attorney about the statute after Brzowski raised it in his complaints. *Id.* at ECF p. 202 of 263.

### Discussion

Under Federal Rule of Civil Procedure 50, a court may enter judgment as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). In other words, the essential question before a court weighing a motion for judgment as a matter of law is "whether

the evidence as a whole, when combined with all reasonable inferences permissibly drawn from that evidence, is sufficient to allow a reasonable jury to find in favor of the plaintiff." *Hall v. Forest River, Inc.*, 536 F.3d 615, 619 (7th Cir. 2008). When deciding a Rule 50 motion, a court is not permitted to reweigh the evidence, draw its own inferences from the evidence, or substitute its determination regarding the credibility of the witnesses for those made by the jury. *Gower v. Vercler*, 377 F.3d 661, 666 (7th Cir. 2004).

Federal Rule of Civil Procedure 59 permits a new trial "where the verdict is against the clear weight of the evidence or the trial was not fair to the moving party." *Morris v. BNSF Ry. Co.*, 969 F.3d 753, 764 (7th Cir. 2020) (internal quotation marks omitted). A new trial is only appropriate where the record demonstrates that "the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Davis v. Wisconsin Dep't of Corr.*, 445 F.3d 971, 979 (7th Cir. 2006) (internal quotation marks omitted).

**A.     Judgment as a matter of law**

Sigler cites four grounds to support her motion for judgment as a matter of law: (1) she was not deliberately indifferent because she relied on her reasonable interpretation of *Johnson*; (2) no reasonable jury could find that she was aware or strongly suspected that Brzowski was being held beyond the date he was legally entitled to be released; (3) Brzowski's claim is precluded by the Seventh Circuit's recent decision in *Wells v. Caudill*, 967 F.3d 598 (7th Cir. 2020); and (4) even if Brzowski's claim is viable, she is entitled to qualified immunity. The Court considers each argument in turn.

### 1.    How Sigler dealt with Brzowski's complaints

An incarcerated person may sustain a claim for an Eighth Amendment violation if he is incarcerated for longer than he should have been without penological justification because of the deliberate indifference of prison officials.  *See Childress v. Walker*, 787 F.3d 433, 439 (7th Cir. 2015); *Armato v. Grounds*, 766 F.3d 713, 721 (7th Cir. 2014). "Deliberate indifference requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk." *Figgs v. Dawson*, 829 F.3d 895, 903 (7th Cir. 2016).  An official is also deliberately indifferent when she "does nothing" or when she "takes action that is so ineffectual under the circumstances that deliberate indifference can be inferred."  *Id.*

Citing the Seventh Circuit's decisions in *Armato* and *Campbell v. Peters*, 256 F.3d 695 (7th Cir. 2001), Sigler argues that she should be granted judgment as a matter of law because she reasonably relied on her interpretation of the Supreme Court's decision in *Johnson*, a case in which the Court held that a federal statute—18 U.S.C. § 3624(e)—did not "reduce the length of a supervised release term by reason of excess time served in prison" for a federal prisoner.  *Johnson*, 529 U.S. at 60.  Even though her interpretation of *Johnson* was rejected by the Illinois Appellate Court as applied to an Illinois state sentence, Sigler contends that she was only mistaken, not deliberately indifferent.

It is certainly true that the Seventh Circuit has previously held that prison officials, relying on reasonable interpretations of law, are not deliberately indifferent even if

courts later determine that those interpretations were wrong.[2]  *See Armato*, *766* F.3d at

721 (stating that prison officials, when "making determinations about a prisoner's

release," are allowed to "rely upon 'a reasonable interpretation of a state statute' even if

they are ultimately mistaken"); *Campbell*, 256 F.3d 701–02 (affirming the district court's

grant of summary judgment after holding that state officials reasonably interpreted a

state statute even though that interpretation was later found to be incorrect).

Here, though, there is a sufficient evidentiary basis to support the jury's finding

that Sigler did not actually rely on a reasonable interpretation of *Johnson*.  Though she

testified that she received training on the *Johnson* opinion and that she read the

decision at training, Sigler could not remember how recently the training occurred.  Dkt.

No. 176–2 at ECF pp. 177–78 of 263.  Sigler conceded that she did not read the

decision before reviewing Brzowski's case and did not confirm that *Johnson* applied to

Brzowski's circumstances before she "audited" his sentencing calculation.  *Id.* at ECF p.

178 of 263.  Finally, Sigler conceded that she could not "fully apply" *Johnson* without

first consulting a lawyer, which she did not do.  *Id.* at ECF pp. 183, 194 of 263.

Sigler argues in her reply that the latter testimony concerns the *Johnson*

decision's "application to *federal* inmates and the fact that she would need consult an

attorney to fully understand the application of the decision to that class of individuals."

Sigler's Reply at 3 n.1 (emphasis added).  But this favorable-to-Sigler interpretation is

---

[2] *Armato* and *Campbell* entitle state officials to rely on state law.  Here the contention is
that a state official applying a state statute is entitled to rely on federal law interpreting a
particular federal statute.  Though it is less than obvious, for present purposes the Court
will assume, without deciding, that a state prison official is entitled to rely on a
reasonable interpretation of federal law in this context.  *See Armato*, *766* F.3d at 721;
*Campbell*, 256 F.3d 701–02.

not supported by the full colloquy:

> Q. You do understand that the Johnson decision applies to federal inmates?
> A. Because you said it was a federal ruling.
> Q. Okay. You don't even know what it applies to then, the factual basis of Johnson?
> A. Not totally, no, because I'm not an attorney.
> Q. *In fact, you would need to talk to an attorney to fully understand it, correct?*
> A. *To fully understand it, yes.*
> Q. *And to fully apply it, correct?*
> A. *Yes.*

Dkt. No. 176–2 at ECF p. 194 of 263 (emphasis added). In short, the Court does not read the testimony the way Sigler argues it now, and the jury was not required to read it that way either. In fact, the law at this stage requires viewing the evidence in the light most favorable to the party that prevailed before the jury, not in the light most favorable to Sigler as she in effect contends.

Sigler's admissions support the jury's verdict, as they would allow a reasonable jury to infer that she did not rely on a reasonable interpretation of *Johnson* and was deliberately indifferent in failing to take proper action in response to Brzowski's complaints—indeed by largely ignoring them or giving Brzowski the brush-off after the initial complaint. *See Figgs*, 829 F.3d at 903.

The fact that Sigler failed to consult counsel, alone, distinguishes this case from *Armato*. There the Seventh Circuit noted that the defendants were not deliberately indifferent, in part, because they "were actively pursuing assistance from the [Attorney General's] Office from the moment they discovered [the plaintiff's] release appeared contrary to state law" and that at least one of the defendants "believed he was 'on sound legal footing'" in holding the plaintiff until IDOC received guidance from the

Attorney General's office.  *Armato*, 766 F.3d at 721; *see also Schneider v. Cty. of Will*, 528 F. App'x 590, 594 (7th Cir. 2013) ("Seeking legal advice . . . or asking a judge for written clarification . . . are reasonable steps that preclude finding deliberate indifference." (citations omitted)).  Here, Sigler admitted that she could not "fully apply" *Johnson* to Brzowski's situation without consulting legal counsel, *id.* at ECF p. 194 of 263, and yet she did not consult counsel before using *Johnson* to reject Brzowski's complaints, *id.* at ECF p. 183 of 263.

What is more, despite Sigler's contention that her reliance on *Johnson* refuted the claim of deliberate indifference, at trial Sigler made little effort to explain why she believed *Johnson* applied to Brzowski's circumstances and no effort at all to offer evidence indicating her supposed interpretation of *Johnson* was reasonable.  Sigler notes in her reply brief that, under questioning from her counsel, she explained that she was trained on the case by IDOC attorneys and that she understood *Johnson* prevented the application of excess jail credits to parole time.  Dkt. no. 176–3 at ECF p. 34 at 125. Fair enough.  But this did not engage with her earlier testimony, under questioning from Brzowski's counsel, that she could not "fully apply" *Johnson* to Brzowski's situation without consulting legal counsel, dkt. no. 176–2 at ECF p. 194 of 263, and yet did not seek assistance from counsel before applying it to him, *id.* at ECF p. 183 of 263.  Nor did defendants make any effort to elicit an explanation of why Sigler was so certain a case applying a federal statute to a federal prisoner would have anything to do with Brzowski, a state prisoner incarcerated under state law.  Without these answers, the jury was permitted to infer unfavorably to Sigler and favorably to Brzowski.

There is additional evidence—indirectly related to *Johnson*—that supports a

reasonable inference that Sigler's did not reasonably rely on *Johnson*. Brzowski contended that upon receiving his complaint, Sigler looked at his calculation sheet, which mentioned *Johnson*, and rubber-stamped it without inquiry. Dkt. no. 176–3 at ECF pp. 91–92 of 125. Brzowski presented evidence sufficient to show this, some of which the Court will now recount. First, although Sigler claimed she conducted a thorough review of Brzowski's complaints, there was evidence to the contrary. Brzowski offered into evidence a handwritten document from his master file titled "Brzowski M29120 Calculation."[3] *See* Dk. No. 181–8 at ECF p. 2 of 2. That document—a handwritten calculation of Brzowski's sentence—outlined his IDOC incarceration before his July 2015 sentencing and concluded that, as of November 1, 2015, Brzowski had "served his full sentence." *See id.* Unlike the NRC calculation Sigler relied on, the exhibit does not mention *Johnson*. *See id.* In short, the exhibit directly contradicted Sigler's conclusion about Brzowski's eligibility for release. Sigler conceded that this calculation was in Brzowski's master inmate file but denied seeing it before her deposition. Dkt. no. 176–2 at ECF pp. 215–18 of 263. The jury was entitled to view this document favorably to Brzowski on the question of deliberate indifference (though the evidence was sufficient to support the jury's finding even without this document).

Second, although Sigler said she reviewed Brzowski's Pontiac master file

---

[3] At trial, there was some debate regarding who prepared this document and how and when it got in Brzowski's master file. The question was never definitively answered, but Sigler conceded that her failure to review the document did not mean it was not in the master file in the time Brzowski was at Pontiac. Dkt. No. 176–2 at ECF p. 215 of 263. Sigler's theory was that the document must have been placed in Brzowski's master file after he was transferred from Pontiac. Dkt. No. 176–3 at ECF p. 111 of 125. The jury was not required to see it that way, however; it could have viewed this evidence as supporting its ultimate conclusion.

thoroughly, at first the only master file she reviewed was the one she received from the NRC—the one created from his incarceration triggered by his July 22 mittimus. *See* Dkt. no. 176–2 at ECF p. 225–26 of 263. She did not request Brzowski's previous master file—the one from his incarceration at Pinckneyville—until *after* the appellate court decision ordering his release. *Id.* at ECF p. 224–25 of 263. The Pickneyville master file referenced Brzowski's earlier 2013 MSR violation, the violation that would have made him eligible for release when he was resentenced in 2015. As Brzowski notes in his response brief, Sigler's failure to request Brzowski's previous master file allowed the jury to reasonably infer that she assumed that Brzowski had not been a prior IDOC prisoner before his arrival to Pontiac because he was sentenced in Will County on July 22, and "violated at the door" three days later on July 28, 2015.[4] Had she seen the Pickneyville file, Sigler would have been alerted to the 2013 MSR violation and to the fact that he was eligible for release eight days after the July 22 sentencing order.

Third, the jury heard Sigler agree that Brzowski directed her to 730 ILCS 5/3–3–9(a)(3)(ii))—the statute he cited in a complaint, to rebut her reliance on *Johnson*. Dkt. no. 176–2 at ECF pp. 201–02 of 263. She testified that she never consulted an attorney about the statute after Brzowski raised it. *Id.* This is the very statute that the Illinois Appellate Court ruled entitled Brzowski to credit for time served while in prison after his 2013 MSR violation toward the four-year MSR term in his new sentence. In sum, on

---

[4] "A 'violation at the door' . . . is the result of (1) the authority granted to the Prison Review Board to set out the conditions for a parolee's release and determine whether a violation of his MSR conditions should result in a revocation of his release, and (2) the IDOC's responsibility to determine whether a parolee is in compliance with the conditions of his MSR." *Armato*, 766 F.3d at 718.

the basis of her testimony and the evidence introduced, the jury could reasonably conclude that Sigler's claimed investigation of Brzowski's sentencing grievances amounted to deliberate indifference. *See Figgs*, 829 F.3d at 903. That conclusion is not surprising given that Sigler did not actually explain why she was so certain *Johnson* applied in the first place, and it is especially not surprising in light of her admission that she could not really apply *Johnson* without consulting with IDOC counsel but that she never did so—and nonetheless "relied" on that case to keep Brzowski wrongfully imprisoned.

In addition, though Sigler claimed to have conducted a thorough investigation of Brzowski's complaints, the jury could reasonably conclude otherwise, given that she did not see the "Brzowski M29120 Calculation" document until her deposition or that she did not request Brzowski's Pickneyville master file until after his appeal. *See id.* ("A state officer is deliberately indifferent . . . when [s]he takes action that is so ineffectual under the circumstances that deliberate indifference can be inferred."); *Campbell*, 256 F.3d at 702.

Moreover, even after being pointed to the statute that would ultimately undermine her reliance on *Johnson,* Sigler did not change her course of action or seek counsel. *See Schneider*, 528 F. App'x at 595 (determining that a jury reasonably could conclude that the defendant's "chosen course of action—continuing [the plaintiff's] imprisonment based on a layperson's dubious evaluation of [the plaintiff's] legal concern—was so deficient as to constitute deliberate indifference" and remanding for consideration of that question).

For these reasons, the jury could reasonably find that Sigler repeatedly "ignored

a known risk"—Brzowski's continuing and unjustified imprisonment—and was therefore deliberately indifferent. *See Figgs*, 829 F.3d at 903.

## 2.    Awareness that Brzowski's release was required

Sigler next argues that judgment as a matter of law is proper because she had no reason to suspect that Brzowski was being held beyond his release date, as "various courts held otherwise." Sigler's Mot. at 7. Finding otherwise, she contends, "implies that she should have flouted" court orders that denied Brzowski immediate release. Sigler's Reply at 6.

It is worth noting that the case Sigler cites for this argument, *Burke v. Johnston*, 452 F.3d 665 (7th Cir. 2006), requires only that "a prison official kn[o]w of the prisoner's problem and thus of the risk that unwarranted punishment [i]s being inflicted." *See id*. at 669 (citing *Moore v. Tartler*, 986 F.2d 682, 686 (3d Cir. 1993)). Here, Sigler unquestionably knew of Brzowski's problem—and thus of a risk that unwarranted punishment was being inflicted—even if she didn't *believe* in Brzowski's problem.

In any event, this argument—a variation on a theme—has already been rejected by this Court in a previous order and is rejected again. *See Brzowski v. Sigler*, No. 17 C 9339, 2020 WL 3489484, at *6 (N.D. Ill. June 26, 2020). Sigler presented this argument to the jury in her closing, and the jury manifestly rejected it. As the Court noted in its previous opinion, the Will County court's judgment order at the heart of this case—the one Sigler reviewed in Brzowski's master file—stated that Brzowski was entitled to 1,452 days of time served in custody as of the date of that order. Sigler did not apply the order that way, and Brzowski was forced to turn the courts. A reasonable jury could, and obviously did, find that Brzowski's continued detention was a result of

Sigler's deliberate indifference.  That conclusion was not improper based on the evidence presented at trial and the evidence discussed above.  For example, the jury may have concluded that Brzowski would not have had to seek vindication in the Illinois state courts had Sigler sought assistance from IDOC counsel about *Johnson*'s application or asked for his Pickneyville master file earlier.

### 3.    Qualified Immunity

Sigler argues that she is entitled to qualified immunity because her actions did not violate Brzowski's clearly established rights.  Qualified immunity shields government officials from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)) (internal quotation marks omitted).

When a defendant asserts a defense of qualified immunity, a plaintiff must demonstrate "that there has been a violation of one or more of her federal constitutional rights" and "that the constitutional standards at issue were clearly established at the time of the alleged violation."  *Campbell*, 256 F.3d at 699.  "The law is clearly established when various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand."  *Figgs*, 829 F.3d at 905 (internal quotation marks omitted).  Importantly, "[t]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established."  *Id.*

The main thrust of Sigler's claim here is that even if Brzowski demonstrated that his constitutional rights were violated, the right was not clearly established at the time

the violation occurred. According to Sigler, no Seventh Circuit case has answered the question in the way she presents it: "whether it was clearly established that [Sigler] violated the Eighth Amendment by failing to credit Plaintiff time towards his MSR term when she believed he had previously been discharged from IDOC custody and therefore relied on the *Johnson* decision." Sigler Reply at 7.

Sigler is trying to write the rules in a way that guarantees her a win. Though she repeatedly denies it, her argument amounts to a contention that she is entitled to qualified immunity because there is no case that is "'on all fours'" with the facts and circumstances of the case as she sees them. *See Laba v. Chicago Transit Auth.*, No. 14 C 4091, 2015 WL 3511483, at *3 (N.D. Ill. June 2, 2015) (citing *Forman v. Richmond Police Dep't*, 104 F.3d 950, 958 (7th Cir. 1997)). But the law does not require this. Rather, it requires only that there is precedent that is not "distinguishable in a fair way." *See Figgs*, 829 F.3d at 905 (internal quotations marks omitted).

The circumstances between this case and that in *Figgs* are not distinguishable in a fair way. In *Figgs*, as in this case, the plaintiff complained to a prison recordkeeper that he was being held past his actual release date due to errors in recordkeeping. *See id.* at 899–900. The district court granted summary judgment in recordkeeper's favor on qualified immunity grounds, but the Seventh Circuit reversed. *Id.* at 902. Although the recordkeeper had performed an investigation, the Seventh Circuit reasoned that a jury could find that investigation "so ineffectual that it rose to the level of criminal recklessness and thus constituted deliberate indifference." *Id.* at 905. Moreover, the court noted that at the time the plaintiff made his complaints in 2011, "it was clearly established . . . that the failure to investigate a claim that an inmate is being held longer

than the lawful term of his sentence violates the Eighth Amendment if it is the result of indifference." *Id.* at 906.

Like Sigler, the recordkeeper in *Figgs* sought to be shielded by qualified immunity, arguing that the qualified-immunity inquiry should be whether the recordkeeper violated clearly established law "by failing to recalculate Figgs's sentence in response to his concerns or by referring it to the chief record office." *See id.* at 905–06 (internal quotation mark omitted). But the Seventh Circuit noted that analyzing the qualified-immunity inquiry as proposed, would mean ignoring the "broader deficiencies" with the recordkeeper's course of action, namely her ineffectual review of the plaintiff's master file. *See id.* at 906. Therefore, the court posited that the more appropriate inquiry was "whether it was clearly established that [the recordkeeper's] failure to investigate the substance of Figgs's complaints violated his constitutional rights by requiring him to serve more time than his sentence required." *Id.* at 906.

As in *Figgs,* Sigler's proposed framing for the qualified-immunity inquiry would mean ignoring the broader deficiencies in her course of action, as described above. Because "it was clearly established . . . that the failure to investigate a claim that an inmate is being held longer than the lawful term of his sentence violates the Eighth Amendment if it is the result of indifference," *id.* at 906, Sigler is not entitled to qualified immunity.

### 4.    *Wells v. Caudill*

In July 2020, the Seventh Circuit decided *Wells v. Caudill*, 967 F.3d 598 (7th Cir. 2020), a case Sigler argues bars Brzowski's Eighth Amendment claim. To make this point, Sigler relies on a portion of *Wells* that discusses what the majority describes as

"one of the parties' mutual assumptions":  that "the Eighth Amendment permits a federal court to resolve disputes of state law that affect sentence length*."  Id.* at 602.  In this section of *Wells*, the court states that the Seventh Circuit has concluded only that keeping a person beyond the end of his term in prison violates the Eighth Amendment if the proper length of imprisonment is "uncontested."  *Id.*  In other cases where "the proper date of release was contested as matter of state law," the opinion states, the litigants "simply assumed that the federal court can use an error of state law as the basis of an award of damages under the Eighth Amendment," and the Seventh Circuit resolved those appeals as presented but without holding that such claims are permitted.  *See id.*

The majority in *Wells* also noted two further potential issues with cases like this.  The first is that "an error of state law is not properly rectified by deeming that error a constitutional tort."  *Id.*  Why, the court asked, is a state prisoner who complains that state officials miscalculated his sentence's ending date required to file in state court, while a state prisoner who served out his sentence and seeks damages is presumably allowed to file in federal court?  *See id.*  The second potential issue referenced by the court involves *Heck v. Humphrey*, 512 U.S. 477 (1994).  The majority in *Wells* wondered whether the Seventh Circuit's *Heck*-related precedent would require a former state prisoner to "obtain a ruling from a state court establishing his proper release date."  *Wells*, 967 F.3d at 602.

Sigler argues that *Wells* is fatal to Brzowski's claim.  In fact, however, the portions of *Wells* upon which Sigler relies appear to be dicta.  The majority in *Wells* was careful to "make clear" that it had not decided the issues it raised "in passing" and,

therefore, that these matters are "open for consideration" in a future case. *Id.* at 602. Judge Ripple, the dissenting judge, agreed. *Id.* at 605. With this in mind, this Court declines Sigler's invitation to do what the Seventh Circuit declined to do in that case.

It's also worth noting that some of the Seventh Circuit's concerns in *Wells* are not implicated by Brzowski's case. First, there is no *Heck* bar issue here, as Brzowski exhausted his state court remedies and obtained a state court ruling that established his proper release date and ordered his immediate release. *See Brzowski,* 2017 IL App (3d) 160228-U, ¶ 18. In short, there is no lingering question about Brzowski's proper release date. Second, Sigler seems to be arguing that *Wells* stands for the proposition that "errors of state law" and "errors in constitutional law" are two mutually exclusive categories of errors, similar to a Venn diagram with two circles that do not touch or overlap with each other. As stated above, the Court is not convinced that is true and, in any event, Brzowski's case (even if viewed charitably to Sigler) does not involve an error in state law but instead an error in reliance on federal case law.

Another problem with this argument is one of characterization. Imagine a case in which a person is sentenced to a one-year prison term, but the warden holds him for two years and rebuffs the person's repeated protests. One could call that an "error of state law" too, as the warden had misapplied a state court judgment. But in that case the warden, though perhaps *also* making an error of state law, violated his prisoner's federal constitutional rights by consciously holding him beyond his legal prison term and rebuffing his repeated complaints about unauthorized imprisonment. Calling what happened here a mere "error of state law" does not fully capture what the evidence showed and what the jury reasonably was permitted to infer.

For these reasons, the Court denies Sigler's motion for judgment as a matter of law.

**B.    New trial**

Alternatively, Sigler moves for a new trial.  In addition to reasserting the four arguments she made to support her motion for judgment as a matter of law, she argues that the jury's decision to award punitive damages was against the manifest weight of the evidence.  Even under Rule 59's more liberal standard, Sigler has not demonstrated that "the jury's verdict resulted in a miscarriage of justice" or that "the verdict, on the record, cries out to be overturned or shocks [the] conscience."  *Davis*, 445 F.3d at 979 (internal quotation marks omitted).  As discussed, the jury's verdict finds ample support in the record, and there is no proper basis for the Court to disturb it.  Thus, the Court overrules each of Sigler's reasserted arguments.

On the question of punitive damages, a jury may award punitive damages against a defendant in a section 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Green v. Howser*, 942 F.3d 772, 781 (7th Cir. 2019) (internal quotation marks omitted); *see also Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 930 (7th Cir. 2004) ("Punitive damages are recoverable in § 1983 actions where the defendant had a reckless or callous disregard to the federally protected rights of others . . . . [t]his is the same standard as for § 1983 liability," as both "require a determination that the defendants acted with deliberate indifference or reckless disregard.'")

Sigler would have the Court append an additional requirement for punitive

damages.  Citing the Seventh Circuit's decisions in *Kyle v. Patterson*, 196 F.3d 695 (7th Cir. 1999), and *EEOC v. Indiana Bell Telephone Co.*, 256 F.3d 516, 527 (7th Cir. 2001), and the First Circuit's decision in *Iacobucci v. Boulter*, 193 F.3d 14, 26 (1st Cir. 1999), Sigler contends that punitive damages are only available when "the defendant violated the plaintiffs' [sic] civil rights in the face of a perceived risk that his or her actions will violate federal law."  Sigler's Br at 13; *see also* Sigler's Reply Br. at 12–13.  The Court disagrees.

*Kyle*—a section 1983 case—only said that "[m]uch more than mere negligence is required . . . before punitive damages may be awarded."  *Kyle*, 196 F.3d at 698.  And the Seventh Circuit affirmed the grant of summary judgment in *Kyle* because there was not more than mere negligence.  There were no facts that came "close to showing evil motive or the level of deliberate indifference necessary to support an award of punitive damages."  *Id.*  That reasoning is not in conflict with the standard the Court applies here.  *Compare Kyle*, 196 F.3d at 698 *with Green*, 942 F.3d at 781.

In *EEOC v. Indiana Bell*—a case under section 42 U.S.C. §1981—the court stated that the "minimum requirement for a punitive award is that the employer 'discriminate in the face of a perceived risk that its actions will violate federal law.'" *Indiana Bell*, 256 F.3d at 516 (citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999) (applying the same standard in another section 1981 case).  Sigler does not explain why a ruling in a Title VII employment discrimination case should have any bearing here.  But even if she had tried to explain this, it would not get her past this fact:  the Seventh Circuit has expressly stated—unsurprisingly—that the standard for the availability of punitive damages in section 1983 actions is the one found in *Smith v.*

*Wade*, 461 U.S. 30, 56 (1983).  *See Alexander v. City of Milwaukee*, 474 F.3d 437, 453

(7th Cir. 2007) (stating that "the Supreme Court enunciated the appropriate standard for

the availability of punitive damages in an action under § 1983: '[A] jury may be permitted

to assess punitive damages in an action under § 1983 when the defendant's conduct is

shown to be motivated by evil motive or intent, or when it involves reckless or callous

indifference to the federally protected rights of others.'").  In short, Sigler's alternative

standard drawn from *Kolstad* is not in harmony with the *Smith* standard that has been

adopted by the Seventh Circuit for section 1983 cases.

 In *Iacobucci*—a 1983 case—the First Circuit held that punitive damages are

available when a plaintiff produces evidence sufficient to prove that the defendant acted

"in the face of a perceived risk that his actions would violate federal law."  *Id.*, 193 F.3d

at 26 (citing *Kolstad,* 527 U.S. at 536) (alterations accepted).[5]  Though *Kolstad* is a

section 1981 case, the First Circuit reasoned that because Congress drafted section

1981's punitive damages provision based on the language employed in *Smith*, and the

Supreme Court "interpreted the relevant statutory terms in lockstep with its

understanding of the parallel language in *Smith,*" it followed that *Kolstad*'s holding was

fully applicable to the consideration of punitive damages in the section 1983 context.  *Id.*

at 26 n.7.

 Of course, we are in the Seventh Circuit, not the First and thus *Iacobucci* is in no

way binding.  This alone would be enough to move past Sigler's argument, but there is

more.  First, as noted earlier, the Seventh Circuit has stated that the *Smith* standard is

---

[5] *Iacobucci* was cited in *Kyle*—only once, without a quote or even a parenthetical for
explanation—along with *Smith*.  *See Kyle*, 196 F.3d 695, 698 (7th Cir. 1999).

the appropriate standard for section 1983 punitive damages, *see Alexander*, 474 F.3d at 453, and it continues to cite to that case when describing the appropriate standard. *See, e.g., Green*, 942 F.3d at 781; *Alexander*, 474 F.3d at 453; *Woodward*, 368 F.3d at 930; *Ollie v. Atchison*, 753 F. App'x 406, 407 (7th Cir. 2019); *Wright v. Miller*, 561 F. App'x 551, 555 (7th Cir. 2014). Grafting *Kolstad* to *Smith* as Sigler suggests would fly in the face of these decisions.

Second, the fact that *Kolstad* used *Smith* to understand the availability of punitive damages in section 1981 does not mean that *Kolstad* may be used to understand *Smith* and the availability of punitive damages under section 1983. The court in *Kolstad* did not hold that the two punitive damages standards were coterminous. *Kolstad,* 527 U.S. at 536. Rather, the Supreme Court recognized that Congress looked to the punitive damages standard in *Smith* when it drafted similar language for use in section 1981. *Id.* Therefore, the Supreme Court concluded that *Smith*'s punitive damages standard must be applied "in the context of" section 1981. *Id.* The holding that was born of that alchemy was that—in section 1981 suits—"an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.* at 536. *Kolstad* in no way suggests that the *Smith* standard has been modified or that section 1983 is affected by its holding.

Applying the standard adopted by the Supreme Court in *Smith*, the merits analysis here is fairly straight forward. Sigler essentially argues that the award of punitive damages is against the weight of evidence because she believed Brzowski was not eligible for release due to *Johnson*. The jury rejected that contention, however. Its decision was neither improper nor against the manifest weight of the evidence. Without

recounting the entirety of the evidence discussed above, there was sufficient evidence to support an award of punitive damages. In particular, the jury reasonably could find that Sigler's claimed reliance on *Johnson* amounted to reckless disregard for Brzowski's rights, given that Sigler made no effort to confirm that *Johnson* applied to Brzowski's circumstances, dkt. no. 176–2 at ECF p. 178 of 263, and conceded that she could not "fully apply" *Johnson* without first consulting a lawyer, which she did not do, *id.* at ECF pp. 183, 194 of 263.

Moreover, the jury heard (among other things) that Sigler acted despite not knowing the details of how Brzowski "violated at the door," *id.* at ECF pp. 173–77 of 263; that she made no effort to get Brzowski's previous master file—from his incarceration at Pinckneyville—until after the June 18, 2017 appellate court decision requiring his release, *id.* at ECF pp. 224–25 of 263; and, even though Brzowski cited it, Sigler never consulted an attorney about 730 ILCS 5/3–3–9(a)(3)(ii), a statute she conceded she could not accurately apply without consulting counsel, *id.* at ECF pp. 201–02 of 263.

In short, the jury reasonably could infer that Brzowski's prolonged incarceration was due to Sigler's reckless or callous indifference to his complaints.

## Conclusion

For the reasons stated above, the Court denies Sigler's motions for judgment as a matter of law and new trial [dkt. no. 176]. The Court will issue a separate ruling on Brzowski's petition for attorney's fees.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: June 21, 2021